# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

PR Nita Gordon, *Personal
Representative of the Estate of
Antonio Gordon*,

        Case No. 18-13834

          Plaintiff,

        Judith E. Levy
        United States District Judge

v.

        Mag. Judge R. Steven Whalen

Keith Bierenga *et al.*,

          Defendants.

_____/

# OPINION AND ORDER DENYING DEFENDANT BIERENGA'S MOTION FOR SUMMARY JUDGMENT [58]

## I.    INTRODUCTION

On December 11, 2018, Plaintiff brought this civil rights action pursuant to 42 U.S.C. § 1983 based upon Defendant Royal Oak Police Officer Keith Bierenga's use of deadly force in an altercation with decedent Antonino Gordon[1] in the drive-through window of a White

---

[1] Though the deceased's name is listed in the caption as "Antonio," obituaries for Mr. Gordon confirm that his name is "Antonino." Out of respect for the deceased,

Castle restaurant. (ECF No. 1.) Plaintiff Nita Gordon, Personal Representative of the Estate of Antonino Gordon, brought one count of excessive force against Defendant Bierenga through 18 U.S.C. § 1983.[2] Plaintiff requested medical and hospital expenses, compensation for pain and suffering, compensation for emotional/mental distress, punitive and exemplary damages, reasonable attorney fees, and all additional damages permitted to Gordon's estate pursuant to the Michigan Wrongful Death Act. (ECF No. 1, PageID.7-8.)

On December 23, 2019, Defendant moved for summary judgment on Plaintiff's sole remaining claim, arguing that he is entitled to qualified immunity from liability for the claim of excessive force. (ECF No. 58.) Defendant also argued that the Court must deny Plaintiff's requested relief for emotional distress, loss of a loved one, or other collateral injuries suffered by Gordon's family as improperly brought under § 1983. (*Id.* at PageID.627.) Plaintiff responded on February 12, 2020, and Defendant replied on February 26, 2020. (ECF Nos. 68, 73.) On July 30, 2020, the

the Court will refer to him by the correct spelling of his name in the body of this opinion.

[2] Plaintiff also brought one count of municipal liability against Defendant City Royal Oak for failure to supervise/train, but the Court dismissed this count in June 2019. (ECF No. 28.)

2

Court heard oral argument on this motion through audio-visual technology. For the following reasons, Defendant's summary judgment motion is DENIED. Additionally, the Court finds that Plaintiff's § 1983 damages claim is properly articulated through the Michigan Wrongful Death Act.

## II.   CASE SUMMARY AND BACKGROUND

As a preliminary matter, many of these factual proceedings were captured on audio-video footage from both the White Castle surveillance system and Defendant Bierenga's police dash camera. In cases such as these, when a video captures the events underlying the summary judgment motion, courts must "rely mainly on undisputed video footage from . . . the scene." *Ashford v. Raby*, 951 F.3d 798, 799 (6th Cir. 2020); *see also Lang v. City of Kalamazoo*, No. 17-2199, 2018 WL 3737981, at *3 (6th Cir. Aug. 6, 2018)). On summary judgment, wherever possible, courts must "adopt the plaintiff's version of any facts not caught on film." *Id.* Additionally, "[t]o the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

3

Accordingly, the facts in this opinion are taken primarily from the video evidence, supplemented with facts from elsewhere in the record.[3]

## A. First Traffic Stop

On April 10, 2018, Defendant Royal Oak Police Officer Keith Bierenga pulled over decedent Antonino Gordon. (ECF No. 58-4.) Defendant pulled over Gordon after watching Gordon's car cut off another car by merging quickly from the turn lane into the center lane, forcing the car behind him to quickly slow to avoid a collision. (*Id.* at .44; *see also* ECF No. 58-3, PageID.763.) Defendant pursued Gordon for a couple of blocks with police lights activated before additionally activating his siren. (*Id.*) After another block or so, Gordon stopped his car in the center lane at a red light. (*Id.* at 1:45.) From the police dash camera, Defendant can be seen approaching Gordon's car and speaking through the driver's window. (*Id.* at 2:00.) Defendant testified that, through Gordon's partially open window, he perceived Gordon's skin to be pale, his eyes to be glassy, and his face to be sweating as if "under the influence of

---

[3] The Court considers the audio-video recordings of the underlying facts to be essential in understanding the background of this case. The Court attempted to embed this media into the opinion, but court technology is currently unable to accommodate a mixed-media filing. In the event that the Court becomes able to include the mixed media, it will issue an amended opinion and order.

something." (ECF No. 58-3, PageID.770.) Defendant later testified that he could not see or smell drugs in the car, and he did not perceive any evidence of a firearm. (*Id.* at PageID.775, 778.) Defendant also testified that, while he was speaking to Gordon, he did not inform Gordon of the reason for the stop and he did not advise Gordon that he was under arrest. (*Id.* at PageID.779.)

In the dash cam, Defendant can be seen speaking through Gordon's window for approximately ten seconds (the camera does not capture audio), but then Gordon drives off as soon as the traffic light turns green. (ECF No. 58-4, 1:50-2:02.) Immediately after Gordon drives away, Defendant can be seen running back to his car, where he then tells dispatch over the radio that the driver fled. (*Id.*; ECF No. 58-3, PageId.786.) From the dash cam, Gordon can be seen turning from the center lane into the left lane, and then from the left lane he makes a rapid left turn in front of oncoming traffic into a White Castle parking lot. (*Id.* at 2:02-2:04.) Defendant, who is now back in the police car, follows Gordon into the White Castle Parking lot. (*Id.* at 2:15.) He circles the parking lot once but, seeing no sign of Gordon, exits and begins driving

through the streets immediately surrounding the White Castle. (*Id.* at 2:30-3:30.)

## B. Second Stop and Shooting at White Castle

Defendant testified that, after losing track of Gordon, he provided dispatch with a physical description of Gordon and a description of the make and model of Gordon's car.[4] (ECF No. 58-3, PageID.795.) Approximately twenty minutes later, as Defendant was driving near the White Castle, he spotted a BMW in the White Castle drive-through that "looked very similar to the BMW that had just fled from [him]." (*Id.* at PageID.797.) Defendant pulled into the White Castle and observed Gordon's BMW at the drive-through line. At this time, Gordon was at the drive-through window paying for his order and another car was parked in line about three feet behind him. (ECF No. 5, :1.) Apparently intending to preemptively block Gordon's exit, Defendant pulled into the White Castle and parked at a diagonal angle directly in front of Gordon's BMW,

---

[4] Defendant testified that, at some point, dispatch informed him that "the registered owner of the vehicle was . . . an older gentleman who did not match the description of the driver that I encountered . . . [and that] when dispatch ran [the vehicle owner's address] they found an individual who [] had the same last name [as the vehicle owner and who had ] the approximate same age as the description of the driver I had given and that that individual also had a handgun registered to them." (ECF No. 58-3, PageID.811.) The record is unclear as to when Defendant received this information about the handgun.

6

leaving a couple of feet between the two cars. (*Id.* at :10; ECF No. 58-7-DRIVE THROUGH REGISTER ("DTR"), 6:24:56.)

Meanwhile, Gordon's interaction with the White Castle staff—as well as the subsequent shooting—is clearly visible in the White Castle drive-through camera, and the following facts are taken from that footage. At approximately 6:24 p.m., Gordon can be seen pulling into the White Castle drive-through window. (ECF No. 58-7-DTR, 6:24:28.) The White Castle cashier audibly welcomes Gordon and Gordon's lips move in response, though his voice cannot be heard on the recording. (*Id.* at 6:24:43.) Gordon hands money to the cashier and she opens the register to make change. (*Id.* at 6:24:45-6:24:56.) During this time, Gordon appears to be engaging normally and responsively with the cashier. (*See id.*) Contrary to Defendant's testimony, Gordon does not appear sweaty or pale, and the Court cannot discern any "glassiness" in his eyes. Gordon appears to be making eye contact and he waits calmly in the car while the cashier makes change. (*Id.*)

A few seconds after Gordon hands money to the cashier, Defendant's car can be seen pulling in at an angle in front of Gordon's car. (*Id.* at 6:24:57.) Having exited his vehicle and drawn his gun

7

offscreen, Defendant can be seen walking from the front to the passenger side of Gordon's car. (*Id.* at 6:25:05.) Gordon's head follows Defendant's movements. (*Id.*) Defendant then can be seen walking back around the front of Gordon's car. He disappears offscreen but is clearly now sandwiched between the police car and Gordon's car. (*Id.*) As Defendant walks back directly in front of Gordon's car, Gordon looks back over his right shoulder, puts his car in reverse, and begins to back up. (*Id.* at 6:25:09.) As Gordon reverses the car, Defendant steps forward into the frame with his gun outstretched and pointing directly at Gordon. (*Id.* at 6:25:09.) Gordon quickly reverses his car and it jolts, still in frame, as it backs up about three feet and bumps the car behind it. (*Id.* at 6:25:10.) While Defendant is still in front of Gordon's car, Gordon quickly pulls forward and to the right, with wheels turned sharply toward the right. (*Id.* at 6:25:10-14.) Defendant, who is in front of Gordon and to his left at this time, moves his foot out of the way of the car and can be heard repeatedly yelling "stop!" (*Id.*) The front of Gordon's car bumps into the back wheel of Defendant's car in what appears to be Gordon attempting to maneuver away from the two cars boxing him in. (*Id.* at 6:25:14.) As Gordon begins to back up again to finish the three-point turn, Defendant

8

enters the frame from the left and stands directly outside of Gordon's rolled-down driver window with his gun pointed at Gordon. (*Id.* at 6:25:17.) Though Defendant was previously in front of Gordon's car, he is now to the side of it and almost flush with Gordon's driver door and window. Gordon backs up several feet more and turns his wheels to the right—away from the White Castle, the police car, and Defendant. (*Id.* at 6:25:19.) As Gordon does this, Defendant can be seen following alongside the driver's side of Gordon's car. (*Id.*) As Gordon begins to pull forward and away from the White Castle, Defendant yells "stop" and fires four audible shots at the fleeing vehicle. (*Id.* at 6:25:18-6:25:20.) Subsequent investigation revealed that Gordon received one gunshot wound to the right arm, and one fatal shot to his left arm and chest. (ECF No. 58-8, PageID.886.)

Defendant's dash camera captures Gordon's car driving around the White Castle and toward the street. (ECF No. 58-6, :36.) Defendant, now back in his own car, follows Gordon out of the White Castle and into the street, where Gordon picks up speed in the center lane and then begins to slow down after a few blocks. (*Id.* at 1:09.) As Gordon presumably begins to lose consciousness, Gordon's car eventually drifts toward the

center lane, crosses the median, and slowly crashes into a car in the opposite lane. (*Id.* at 1:20-1:30.) Gordon was subsequently transported to Beaumont Hospital in Royal Oak, where he passed away from the gunshot wounds.[5] (ECF No. 58-8, PageID.883.)

Defendant testified that he shot Gordon "to stop [him] from hitting and killing me or hurting me," and that he believed he was "in direct line of harm at the time [Bierenga] discharged [his] gun." (ECF No. 58-3, PageID.843.) However, in addition to video evidence, three eyewitnesses contradict this account. David Feldman, who was a patron in the restaurant observing the shooting, testified that, "[m]y observation was that [Gordon] was only attempting to flee the scene. His vehicle wasn't in a position to cause the officer harm." (ECF No. 68-13, PageID.1430.) Eyewitness Linda Feldman testified that, "[i]t appeared that the driver was trying to steer away from the officer, trying to get away . . . it doesn't look like [Defendant] was trying to shoot in defense." (ECF No. 68-14, PageID.1452.) Finally, cashier Brianna Washington testified that

---

[5] Gordon's toxicology report indicated that he had a BAC of .27 at the time of death and had cannabinoids in his system. (ECF No. 58-8, PageID.892.) This specific lab information would not have been apparent to Defendant, however, at the time of the shooting.

Gordon "was trying to escape . . . he was trying to leave. [He]e was backing up and trying to get out." (ECF No. 68-17, PageID.1527.)

## III.   LAW AND ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While it is Defendant's burden to identify those portions of the pleadings "which [he] believes demonstrate the absence of a genuine issue of material fact," the burden then shifts to Plaintiff to "set forth specific facts showing that there is a genuine issue for trial," even "go[ing] beyond the pleadings" if necessary. *Pearce v. Faurecia Exhaust Sys.*, 529 Fed. Appx. 454, 457 (6th Cir. 2013) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc.*

*v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

Finally, a court in this circuit has noted that "[d]eadly force cases pose a particularly difficult problem . . . because the officer defendant is often the only surviving eyewitness, and the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Eibel v. Melton*, 904 F. Supp. 2d 785, 805 (M.D. Tenn. Oct. 23, 2012) (quoting *Scott v. Henrich*, 49 F.3d 912, 915 (9th Cir. 1994)). Thus, "the court may not simply accept what may be a self-serving account by the police officer, but must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Id.* (citing *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010)).

**B. Qualified Immunity Standard**

Qualified immunity protects government officials "from liability where [they] reasonably misjudged the legal standard." *Ashford*, 951 F.3d at 801 (quoting *Weinmann v. McClone*, 787 F.3d 444, 340 (7th Cir. 2015)). Courts analyze whether officers are entitled to qualified immunity using two steps: 1) whether the defendant violated a

constitutional right; and 2) whether that constitutional right was clearly established at the time of the alleged violation. *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 864 (6th Cir. 2020).

"For this [second] prong of the qualified immunity analysis, [courts] are not to define clearly established law at a high level of generality." *Id.* at 869, citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). However, courts must still examine "whether the contours of the plaintiff's constitutional rights were sufficiently defined to give a reasonable officer fair warning that the conduct at issue was unconstitutional." *Id.* at 869 (citing *Brown v. Chapman*, 814 F.3d 447, 461 (6th Cir. 2016)). "Fair warning" does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.*

When, as here, a government official raises the defense of qualified immunity, the plaintiff has the burden of demonstrating that the defendant is not entitled to that defense. *Livermore v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

1. <u>Qualified Immunity as Applied to Excessive Force</u>

Under the Fourth Amendment, "[w]hen making an arrest or investigatory stop, the police have 'the right to use some degree of physical coercion or threat thereof to effect it.'" *Wright*, 962 F.3d at 865 (quoting *Graham v. Connor*, 590 U.S. 386, 396 (1989)). However, individuals are still entitled to the Fourth Amendment's protection against unreasonable searches and seizures. Claims of excessive force are therefore analyzed under the Fourth Amendment's "reasonableness" standard. *Graham*, 490 U.S. at 396. To determine whether the force was unconstitutionally excessive, courts make an "objective" inquiry, "considered from the perspective of a hypothetical reasonable officer in the defendant's position and with his knowledge at the time, but without regard to the actual defendant's subjective intent when taking his actions." *Latits*, 878 F.3d at 547. This inquiry evaluates "reasonableness *at the moment of the use of force*, as judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Wright*, 962 F.3d at 865 (quoting *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015)) (emphasis added).

14

When reviewing excessive force cases, the Sixth Circuit considers three non-exclusive factors—the "*Graham* factors"—to be considered under "the totality of the circumstances":

> 1) The severity of the crime at issue;
>
> 2) Whether the suspect poses an immediate threat to the safety of the officers or others; and
>
> 3) Whether he is actively resisting arrest or attempting to evade arrest by flight.

*Wright*, 962 F.3d at 865.

## 2. Deadly Force to Prevent Fleeing Suspects

Deadly force is a "seizure" within the meaning of the Fourth Amendment and is subject to the reasonableness analysis set forth above. *Bullock v. City of Detroit*, No. 19-1287, 2020 WL 2500640, at *6 (6th Cir. 2020). "As a general rule, the Fourth Amendment prohibits the use of deadly force to prevent the escape of fleeing suspects unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Latits*, 878 F.3d at 547 (quoting *Tennessee v. Garner*, 471 U.S. 1 (1985)). "Of the three non-exclusive factors listed in *Graham*, the threat factor is a *minimum*

15

requirement for the use of deadly force." *Id.* at 548 (internal quotations

omitted). As the Sixth Circuit recently explained, it

> has developed "a consistent framework in assessing deadly-force claims involving vehicular flight." *Cass v. City of Dayton*, 770 F.3d 363, 375 (6th Cir. 2014). *The "critical question" is whether the officer had objective "reason to believe that the [fleeing] car presents an imminent danger" to "officers and members of the public in the area." Id.* (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)). Deadly force is justified against "a driver who objectively appears ready to drive into an officer or bystander with his car," but generally not "once the car moves away, leaving the officer and bystanders in a position of safety," unless "the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car." *Id.* (citations omitted). The Sixth Circuit has found deadly force justified by prior interactions demonstrating continuing dangerousness only when the "suspect demonstrated multiple times that he was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around." *Cupp*, 430 F.3d at 775.

*Latits*, 878 F.3d at 548 (emphasis added).

The Sixth Circuit has reiterated many times that, "[a]lthough the

fact that a situation unfolds quickly does not, by itself, permit officers to

use deadly force, we must afford a built-in measurement of deference to

an officer's on-the-spot judgment." *Id.* (citing *Smith v. Cupp*, 430 F.3d

766, 775 (6th Cir. 2005). Additionally, officers are not constitutionally

16

required to use the "least intrusive means available" to effectuate a lawful seizure: the only requirement is that the chosen force be itself reasonable under the totality of the circumstances. *Davenport v. Causey*, 521 F.3d 544, 552 (6th Cir. 2008). Accordingly, it is irrelevant in this case whether Defendant could or should have chosen to use less force against Gordon; rather, the only question is whether the Fourth Amendment permitted lethal force at the time that Defendant shot. *See id.*

Both parties agree that *Latits v. Phillips*—a 2017 Sixth Circuit case which involved the use of deadly force after a high-speed vehicular police chase—is relevant, binding precedent that informs the qualified immunity analysis. The Court agrees and concludes that *Latits* decides this case. Because the *Latits* facts and legal findings are critical to resolution of this case, the Court summarizes them below.

### 3. *Latits v. Phillips*, 878 F.3d 541 (6th Cir. 2017)

In *Latits*, Officer Jaklic stopped Plaintiff Latits' vehicle for making an illegal turn into a neighborhood. 878 F.3d 541, 544 (6th Cir. 2017). When Officer Jaklic pulled over Latits, he saw "one or more bags that he suspected to contain marijuana and a pill bottle, all of which Latits

attempted to move under the passenger seat." *Id.* After ignoring Officer Jaklic's instructions to exit the car, Latits drove away. Officer Jaklic pursued him in his vehicle. *Id.* After Officer Jaklic followed Latits into an empty parking lot and drove into the path of Latits' car, Latits steered away from the officer in what the Sixth Circuit determined was an attempt "to avoid colliding." *Id.* Nevertheless, Officer Jaklic broadcast that Latits had "tried to ram [his] vehicle." *Id.* at 545.

Two additional officers responded to the call, and the three officers pursued Latits by car as Latits drove out of the parking lot and down a highway at sixty miles an hour. *Id.* Through a series of quick turns, one of the officers accidentally collided twice with the back of Latits' car. *Id.* Latits lost control of his car and swerved across the highway, though no pedestrians or other cars were visible on the highway during this chase. *Id.* Another officer intentionally rammed the back of Latits' car, causing Latits to spin out and stop on the grass next to the highway. *Id.* at 546.

As Latits regained control of his car and began to drive forward, apparently intending to continue fleeing, Officer Phillips jumped out of his car and ran on foot toward Latits from behind, ultimately running up beside Latits' front passenger-side door. *Id.* Simultaneously, Officer

18

Jaklic pulled up in front of Latits' car, apparently trying to block him, and the two cars "had a very low-speed head-on collision." *Id.* Latits then attempted to back his car away from Officer Jaklic's. From the front passenger-side door, Officer Phillips fired seven shots at Latits, three of which hit and ultimately killed him. *Id.* Video footage showed that, when Officer Phillips shot Latits, he "could see that no one was in Latits' direct path." *Id.*

When considering qualified immunity as applied to Latits' case, the Sixth Circuit held that a reasonable jury could find that, "because Officer Phillips fired after Latits' car had passed the point where it could harm him, Phillips had time to realize he was no longer in immediate danger. The evidence also shows that Officer Phillips could see that no other officers or other persons were in Latits' path." *Id.* The court cited several other cases in concluding that "deadly force [is] objectively unreasonable when the officer [is] to the side of the moving car or the car had already passed by him—taking the officer out of harm's way—when the officer shot the driver." *Id.*

When evaluating whether Phillips and Latits' prior interactions justified the shooting, the Court took into consideration: 1) it was

19

"undisputed that Latits was fleeing to avoid arrest"; 2) Officer Phillips knew from Officer Jaklic's broadcast that Latits was "originally suspected of possessing narcotics—not a violent crime"; 3) Officer Phillips could see that Latits did not try to ram Officer Jaklic's car; 4) Latits fled at "no more than sixty miles per hour down an almost entirely empty ten-lane divided highway at night"; 5) Latits had shown "no intent to injure the officers"; and 6) "[t]hough Latits did briefly lose control and swerve after [an officer] hit him twice, [] there were no members of the public nearby to be endangered and Latits appeared to regain control of his car." *Id.* at 549. Ultimately, the Court concluded that "[p]ermitting Latits to continue to flee instead of shooting him would not have put the public in imminent danger" because Latits drove "at a maximum of sixty miles" on a "large, effectively empty highway" and because he had

> shown no intention or willingness to drive recklessly through residential neighborhoods. Altogether, Latits' conduct prior to being shot, when viewed in the light most favorable to the Plaintiff, showed a persistent intent to flee but not an intent to injure, and never placed the public or the officers at imminent risk.

20

*Id.* Even with deference to the officers' right to make quick decisions in a "tense, uncertain, and rapidly evolving situation," the court found that Officer Phillips' use of deadly force was unreasonable. *Id.*

## C. Application

Defendant is not entitled to qualified immunity for his use of deadly force against Gordon. Defendant argues that the rapidly evolving events in this case render the application of qualified immunity, at worst for him, a legal gray area. And "when the Court is in a legal gray area, the proper course is to grant summary judgment to the officers, even if the court would hold the officers' conduct unconstitutional in hindsight." *Stevens-Rucker v. City of Columbus, Ohio*, 739 Fed. Appx. 834, 841 (6th Cir. 2018) (citing *Rudlaff v. Gillispie*, 791 F.3d 638, 644 (6th Cir. 2015)).

However, the events clearly captured on video were not so gray as to warrant granting Defendant the broad deference of qualified immunity. Though Defendant was on high alert at the time of the shooting and had just witnessed Gordon driving recklessly, under Plaintiff's version of the facts, it is not clear that Gordon "demonstrated multiple times that he was willing to injure an officer that got in the way

of escape," or that Gordon's driving was so "extremely reckless" that it "threatened the lives of [] those around." *See Latits*, 878 F.3d at 548 (quoting *Cupp*, 430 F.3d at 775). To the contrary, when viewed in the light most favorable to Plaintiff, Gordon's actions evinced an objective intent to flee rather than injure, as Defendant fired only after Gordon began to "move[] away, leaving the officer and bystanders in a position of safety." *See id.*

Drawing all factual inferences in Plaintiff's favor, the Court concludes that objective video evidence and three eyewitness accounts demonstrate that neither Defendant, nor any bystander, was in imminent or serious danger at the time of the shooting. Accordingly, Defendant Bierenga is not entitled to qualified immunity because Defendant's use of force violated Gordon's Fourth Amendment right against unreasonable seizures—a right that was clearly established in the Sixth Circuit through *Latits*.[6]

---

[6] Plaintiff also argues that the unconstitutionality of Defendant's actions was clearly established in four other cases: *Smith v. Cupp*, 430 F.3d 775 (6th Cir. 2005); *Sigley v. City of Parma Heights*, 437 F.3d 537 (6th Cir. 2006); *Kirby v. Duna*, 530 F.3d 475, 482 (6th Cir. 2008); and *Hermiz v. City of Southfield*, 484 Fed. Appx. 13 (6th Cir. 2012). Because the Court finds that the unconstitutionality was clearly established under *Latits*, the Court need not consider these other cases.

1. <u>Defendant Bierenga Violated Gordon's Fourth Amendment Rights</u>

To determine the reasonableness of use of force, the *Graham* test requires the Court consider whether the amount of force was objectively reasonable under the totality of the circumstances by analyzing: 1) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; 2) whether the suspect posed an immediate threat to the safety of the officers or others; and 3) the severity of the crime at issue. *Latits*, 878 F.3d at 547 (citing *Graham*, 490 U.S. at 396.) Because the Fourth Amendment generally "prohibits the use of deadly force to prevent the escape of fleeing suspects unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officers or to others . . . the threat factor is a minimum requirement [in the *Graham* test] for the use of deadly force." *Id.* at 547-48 (citing *Tennessee v. Garner*, 471 U.S. 1, 1 (1985) and *Mullins*, 805 F.3d at 766).

For the reasons below, the Court finds that Defendant cannot prevail on his qualified immunity argument at the summary judgment stage because, under Plaintiff's version of the facts, Defendant violated Gordon's Fourth Amendment rights against unreasonable seizure

23

through deadly force. Though Defendant observed Gordon behaving in a reckless way that created some potential for danger to the community, it is clear when viewing the facts in the light most favorable to Plaintiff that this danger did not rise to the level of "serious" and "immediate" that is a requisite for deadly force. Additionally, Gordon's underlying traffic infractions and flight from police did not justify seizure through deadly force under the totality of the circumstances. Finally, Defendant violated clear precedent warning against shooting fleeing suspects who no longer pose an immediate danger to the police officer or the surrounding community.

> i.   *Whether Gordon was actively resisting arrest or attempting to evade arrest and whether Gordon posed a threat of serious and immediate physical harm*

The Court will consider together the first two *Graham* factors: whether Gordon was actively resisting arrest and whether Gordon posed a threat of serious and physical harm. As to the first factor, while a suspect's flight increases the reasonableness of force in "typical" excessive force cases, deadly force cases are treated differently. "As a general rule, the Fourth Amendment prohibits the use of deadly force to prevent the escape of fleeing suspects unless the officer has probable

cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Latits*, 878 F.3d at 547 (quoting *Tennessee v. Garner*, 471 U.S. 1 (1985)). Thus, in deadly force flight cases, the arrest evasion *Graham* factor is inextricably interrelated with the "serious and imminent threat" inquiry. (*See id.* at 549 ("Because it is undisputed that Latits was fleeing to avoid arrest, we turn to the *Graham* factor that analyzes the severity of the crime at issue").)

As to the second factor, deadly force analysis includes a "minimum requirement" that Defendant have probable cause to believe that Gordon posed a threat of "serious" harm to himself or to the public. *Latits*, 878 F.3d at 547-48. Additionally, the general excessive force test requires an evaluation of whether the officer reasonably believed that the victim posed a threat of *imminent* harm to himself or the public. *Id.* Thus, the compounded question in this deadly force case is whether, when viewing the facts in the light most favorable to Plaintiff, Gordon posed a threat of *serious and imminent* harm to anyone at the time that he was shot. *See id.* For the reasons below, Defendant has not made this showing.

Defendant argues that he had:

objective reason to believe that the fleeing BMW presented an imminent danger to himself, other officers, and members of the public in the area [because Gordon] objectively appeared ready to drive into an officer or bystander with his car and because he had already done so by hitting the car behind him in the drive-thru and Ofc. Bierenga's vehicle. Moreover, [Gordon's] reckless flight across busy rush-hour traffic and driving the wrong way through a parking lot further demonstrated his readiness . . . Gordon demonstrated multiple times that he was willing to injure an officer that got in the way of escape and was willing to persist in extremely reckless behavior that threatened the lives of all those around.

(ECF No. 58, PageID.625-626.)

While it is true that Gordon drove recklessly in a prior interaction with Defendant, it is not clear that Gordon demonstrated that he was "willing to injure an officer." When considering whether a reasonable officer could believe that Gordon's behavior demonstrated a serious threat to officers or bystanders, the Court must consider Defendant's prior interactions with Gordon. *Latits*, 878 F.3d at 549. In this case, Defendant Bierenga observed Gordon 1) appear pale and sweaty while ignoring police instructions; 2) cut off a car ahead of him; 3) drive away from Defendant during the first stop; 4) swerve quickly in front of oncoming traffic when turning left into the White Castle; 5) bump into

26

the car behind him while trying to back away from Defendant and his gun; 6) bump into Defendant's car while attempting to flee at the White Castle; and 7) attempt to drive away from Defendant and the White Castle. While it is true that Gordon drove recklessly when he sped in front of oncoming traffic and when he executed the three-point turn with Defendant sandwiched in between the police cruiser and the BMW, the question is whether these acts, in conjunction with Gordon's prior actions and with all reasonable facts and inferences weighed in Plaintiff's favor, indicated a threat of serious and imminent physical harm such that deadly force was justified. The answer to this question is no.

*Latits* addressed similar concerns. With regard to Gordon bumping the car behind him and in front of him at the White Castle, it is apparent from the video—as well as from three eyewitnesses—that Gordon was not attempting to attack, but was instead attempting to escape confinement by executing a common three-point turn. When "the video permits the reasonable interpretation that [a] collision was accidental, [there] is less justification for deadly force." *Id.* at 549. Additionally, "[w]hether a fleeing suspect showed objective intent to injure officers is relevant to whether the suspect presented sufficient danger to justify

27

deadly force." *Id.* at 550. Accordingly, while the Court must give deference to Defendant's split-second decisions in the "rapidly-evolving" situation wherein he shot soon after the collisions took place, "the fact that this was a rapidly evolving situation does not, by itself, permit him to use deadly force." *Id.* at 551 (citing *Cupp*, 430 F.3d at 775.) Indeed, the *Latits* court noted that "the short time between the collision with an officer's vehicle and the shooting does not, by itself, justify deadly force . . . it [is] unreasonable for the officer to shoot at the driver two seconds after the officer had contact with the driver's car, even though the officer subjectively believed the driver had just targeted and assaulted him with his car." *Id.* (citing *Godawa v. Byrd*, 798 F.3d 457, 466 (6th Cir. 2015)).

In this case, there was about three seconds' pause in between Gordon bumping Defendant's car and the subsequent shooting. (*See* ECF No. 58-7-DTR, 6:25:15 (the first pull forward); 6:25:18 (the first shot).) The Court must credit the fact that Defendant observed Gordon's prior traffic infractions, including watching Gordon speed away from him and then execute a quick left in front of oncoming traffic. This behavior was certainly risky and would increase a reasonable officer's agitation. However, as with the underlying crimes in *Latits*—making an illegal

turn, fleeing from officers, ignoring officer instructions, and (unlike here) the possession of narcotics—none of Gordon's prior actions had been violent, and the traffic infractions were mere misdemeanors. Having seen clear video footage of both underlying traffic infractions, the Court agrees with Defendant that such driving behavior warranted ticketing and posed a moderate risk to other drivers in the city traffic. However, cutting off other cars and executing careless left turns do not rise to the level of excessive risk under Sixth Circuit precedent. Indeed, the Sixth Circuit has discounted far more dangerous driving behavior when conducting an excessive force risk assessment. (*See id.* at 549 (finding insufficient justification for deadly force when Latits led three police cars through a 60-mph chase and had "briefly los[t] control" of his car).)

Finally, the Court must consider Defendant's testimony that he observed Gordon appearing pale and sweaty, as if "under the influence of something." (ECF No. 58-3, PageID.770.) The Court would afford more weight to this assessment if Defendant's deposition were the only evidence of Gordon's condition. However, approximately twenty minutes after Defendant allegedly made this observation, the White Castle surveillance system clearly captured an interaction between Gordon and

the White Castle cashier. To an objective observer, Gordon appears to be interacting normally. His face is neither pale nor sweaty, and his eyes do not appear to be glossy. He is responsive and maintains eye contact. The Court is mindful of its obligation to "rely mainly on undisputed video footage from . . . the scene." *Ashford*, 951 F.3d at 799. The Court is also mindful that, in lethal force cases, "the court may not simply accept what may be a self-serving account by the police officer, but must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story." *See Eibel*, 904 F. Supp. at 805. To this point, the Court notes that, though Defendant testified as to the alleged paleness/sweatiness observation in subsequent officer interviews and in his deposition, he did not report it contemporaneously to dispatch. The record reflects Defendant reporting only his encounter, the infractions, the make/model of Gordon's car, and Defendant's intent to pursue. (*See, e.g.* ECF Nos. 58-2, PageID.666; 58-3, PageID.766.)

While it is theoretically possible that Gordon's appearance and condition could have shaped up in the twenty minutes between Defendant's subjective observation and the objective video footage, the Court is unwilling to make that leap in the face of countervailing

30

evidence. The clear video footage, coupled with Defendant's testimony that he neither smelled nor saw alcohol or narcotics in Gordon's car and Defendant's failure to report a suspected intoxicated driver, casts sufficient doubt on Defendant's self-serving observation that Gordon may have been under the influence at the time of the shooting. The Court will accordingly not consider this observation to be an aggravating factor in this analysis.[7]

Accordingly, taking all of the above factors into consideration— giving deference to Defendant's split-second judgments but viewing the facts in the light most favorable to Plaintiff—the Court cannot conclude that a reasonable officer would have perceived a "serious" or "imminent" threat from Gordon's behavior. Defendant's strongest argument is that, prior to pulling away from the White Castle, Gordon at one point drove his car forward and to the right of Defendant. (*See* ECF No. 58-7-DTR, 6:25:10-14.) Though it is clear from the video footage that Gordon was executing a three-point turn in order to get out of the box in which

---

[7] Nor it is it relevant to this analysis that Gordon's autopsy revealed the presence of alcohol and narcotics in his bloodstream, as the Court may only consider what was apparent to a reasonable officer in Defendant's position. *Latits*, 878 F.3d at 547.

Defendant had trapped him, such a quick motion would have understandably placed Defendant on high alert. If Defendant had shot Gordon at this high-stakes moment, this case would be much closer to the "gray legal area" in which the Court must afford officers broad deference under qualified immunity. *See Stevens-Rucker v. City of Columbus*, 739 Fed. Appx. at 841.

But Defendant did not shoot at this high-stakes moment. He instead shot about three seconds later, after he had charged forward to the safety of Gordon's driver-side window and Gordon had begun to drive away from Defendant and the White Castle. Citing *Mullins v. Cyranek*, Defendant argues that the Court should defer to the heat of the moment, in recognition that officers sometimes "d[o] not have a chance to realize that a potentially dangerous situation ha[s] evolved into a safe one," and that officers may use deadly force within a few seconds of "reasonably perceiving a sufficient danger . . . even if in hindsight the facts show that the persons threatened could have escaped unharmed." *Mullins*, 805 F.3d at 766. However, Defendant's argument and caselaw were rejected by the *Latits* court for the same reason that the undersigned rejects them now:

32

We must undertake an objective analysis, viewing the evidence in the light most favorable to [the defendant] . . . *Mullins* [] is distinguishable. There officers were engaged in physical, hand-to-hand confrontations with a suspect who moments before being shot had held a gun or knife. Here, [the officer]'s life was never in imminent danger, and, under the objective analysis of Latits's slow collision with [the officer]'s car, no other [] life was endangered in the moments before [the officer] fired. Furthermore, the short time between the collision with an officer's vehicle and the shooting does not, by itself, justify deadly force. [We previously] held that it was unreasonable for [an] officer to shoot at the driver two seconds after the officer had contact with the driver's car, even though the officer subjectively believed the driver had just targeted and assaulted him with his car.

*Latits*, 878 F.3d at 550-51. The case to which *Latits* refers is *Godawa v. Byrd*, in which the Sixth Circuit recognized that qualified immunity was inappropriate on summary judgment when, under facts similar to this case, video evidence showed a delay of "less than two seconds" between an officer's perception that he had been intentionally rammed by a vehicle and his subsequent shooting of the driver. *See Godawa*, 798 F.3d at 466 ("Defendant was not in front of the car, but instead was positioned near the rear passenger side, at the time that he fired his weapon. From that position, Defendant would have had no reason to fear being struck by the car as it continued to advance.

Defendant emphasizes how fast the events transpired, noting that he had 'less than two seconds to process being physically assaulted by a vehicle.' Under Plaintiff's version of the facts, however, Defendant was not in danger.")

As in *Latits* and *Godawa*, the objective video evidence in this case demonstrates that Defendant's life was similarly never in imminent danger, though his deposition testimony suggests that he subjectively believed otherwise. Moreover, less than a second after he believed himself to have been attacked, Defendant moved himself to a position of objective safety by running alongside Gordon's driver-side window. If Defendant had stayed toward the front of the car rather than moving alongside it, the Court would be more likely to find that a reasonable officer could have feared being run over by another forward motion. But the precedent does not support extending such credit to an officer who moves to safety and then shoots a fleeing suspect.

Accordingly, when viewed in the light most favorable to Plaintiff, no reasonable officer could conclude that Gordon's driving created a "serious" or "imminent" threat of danger to the public. While it would be reasonable for an officer to assume that Gordon's prior conduct presented

34

some risk to the general public, in that he was clearly willing to quickly swerve in traffic in order to escape Defendant, such conduct does not rise to the level of a "serious" or "imminent" threat justifying deadly force. Additionally, the objective evidence demonstrates that Plaintiff's actions "showed a persistent intent to flee but not an intent to injure," *id.* at 550, which further weakens any justification for deadly force. *See id.*

The Court therefore finds that Defendant has not satisfied the "minimum requirement" for demonstrating justification for deadly force. While it is therefore unnecessary to reach the remaining *Graham* factor, the final factor also supports denial of Defendant's motion.

### ii.    *The severity of the underlying crime(s)*

The Court must also analyze "the severity of the crime at issue," considered "from the perspective of a hypothetical reasonable officer in the defendant's position and with his knowledge at the time, but without regard to the actual defendant's subjective intent when taking his actions." *Latits*, 878 F.3d at 547. Because a reasonable officer could not have believed that Gordon committed anything other than the non-

violent offenses of traffic infractions, reckless driving, and fleeing an officer, this factor also weighs in favor of Gordon.

Defendant summarily argues that the severity of Gordon's underlying crimes supported lethal force because "Mr. Gordon was guilty of multiple dangerous misdemeanors and felonies when Ofc. Bierenga fired, from driving while intoxicated to fleeing and eluding, resisting and obstructing, malicious destruction of police property, assault with the attempt to murder, reckless driving." (ECF No. 58, PageID.625.) However, this argument is unsupported by the record. In *Latits*, the Court considered the fact that Latits was originally suspected of possessing narcotics, though the Court cautioned that this was "not a violent crime." *Latits*, 878 F.3d at 549. The Court also disagreed with the government that Latits' car collisions constituted "crimes": "The videos additionally reveal that Latits did not commit felonious assault, which is also relevant to the *Graham* factor addressing the severity of the crime." *Id.* at 550.

At most, Defendant witnessed Gordon committing two misdemeanors and a felony. The traffic infractions were reckless driving and—for lack of a better legal phrase—cutting someone off. Both of these

36

offenses are misdemeanors in the state of Michigan. M.C.L. § 257.626. Reckless driving does not become a felony in Michigan unless someone gets hurt, and Gordon did not injure anybody. *Id.* Defendant also witnessed Gordon fleeing from and refusing to obey the lawful order of a police officer, which is a felony. M.C.L. § 750.749a. As previously discussed, the Court will not credit Defendant's testimony suggesting an additional known charge of driving under the influence because it is contradicted by clear video evidence.

As to the charges of "malicious destruction of police property" and "assault with the attempt to murder," these charges are like those in *Latits* in that they are blatantly contradicted by the video, which does not demonstrate a *mens rea* requisite to malicious destruction or assault.

Ultimately, in considering Gordon's underlying offenses, the Court is left with two traffic misdemeanors and felonious fleeing from police. These offenses are less serious than the combined traffic, narcotics, and police-ignoring offenses considered in *Latits*, and the *Latits* court dismissed them in less than a full sentence: "not a violent crime." *Latits*, 878 F.3d at 549. Accordingly, because all the crimes that Defendant

observed were non-violent, *Latits* counsels that this factor weighs heavily against the reasonableness of deadly force.

    2. <u>Defendant Bierenga violated clearly established law</u>

"Once, qualified immunity protected officers who acted in good faith. The doctrine now protects all officers, no matter how egregious their conduct, if the law broke was not 'clearly established.'" *Jamison v. McClendon*, No. 16-595, 2020 WL 4497723, at *13 (S.D. Miss. Aug. 4, 2020). Clearly established law "does not require a case directly on point." *Latits*, 878 F.3d at 552 (quoting *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017)). However, as discussed extensively in the previous section, *Latits* is directly on point and held that that a police officer's fatal shooting of a fleeing driver—after observing traffic and non-violent narcotic crimes and after several collisions with police vehicles where it was clear that the suspect was fleeing and had no intent to injure—"was objectively unreasonable and in violation of Latits' constitutional rights." 878 F.3d at 552. For the reasons previously and extensively stated, the Court finds that the facts in this case are similar enough to those in *Latits* that Defendant was on notice that his conduct was unlawful. Defendant's violation is therefore clearly established under *Latits* alone.

Defendant highlights two Supreme Court cases, *Plumhoff* and *Mullenix*, as helpful precedent in his favor. Both cases involve a grant of qualified immunity in high-speed chases. *Plumhoff* involved a 100-mph highway chase during which the suspect "passed more than two dozen other vehicles, several of which were forced to alter course." *Plumhoff v. Rickard*, 572 U.S. 765, 776 (2014). *Mullenix* involved an intoxicated driver who engaged in a "high-speed vehicular flight" and who "twice during his flight had threatened to shoot police officers." *Mullenix v. Luna*, 136 S. Ct. 405, 309 (2015). The Supreme Court gave the officers in these cases great deference based on the officers' reasonable beliefs about the danger posed by the fleeing suspects based on their prior interactions. *See id.* However, these cases involved vehicular chases under much more reckless circumstances than did Gordon's, and they involved actions on the part of the decedents that were far more overt and threatening than anything Gordon did in December 2018. *See Plumhoff*, 572 U.S. at 769-770 (decedent sped away at more than 100 mph before colliding into two police vehicles); *Mullenix*, 136 S.Ct. at 309 (decedent was intoxicated, sped away between 85 and 110mph, and twice threatened to shoot police officers if they did not abandon their pursuit).

For these reasons, the Court finds that *Plumhoff* and *Mullenix* can both be distinguished and are therefore not helpful to deciding this case. Defendant's use of deadly force violated Plaintiff's right to be free from excessive force during his vehicular flight, and this right was clearly established through the Sixth Circuit's 2017 decision *Latits v. Phillips*.

### D. Wrongful Death Limitations

Defendant also argues that the Court must deny Plaintiff's requested relief for emotional distress, loss of a loved one, or other collateral injuries suffered by Gordon's family. (ECF No. 58, PageID.627.) However, for the reasons below, Defendant's caselaw is outdated and Plaintiff's damage claims may proceed as articulated through the Michigan Wrongful Death Act.

Relying on *Jaco v. Bloechle* and *Claybrook v. Birchwell*, Defendant argues that § 1983 "is a personal action cognizable only by the party whose civil rights had been violated . . . no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral inquiries allegedly suffered personally by the

victim's family members." (*Id.*, quoting *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000).)

However, Defendant's cases have since been reconstrued by the Sixth Circuit. While it is true that § 1983 does not contain its own cause of action for familial and hedonic damages, Plaintiff correctly points out that the Sixth Circuit has allowed such claims to go forward where, as here, a plaintiff ties her § 1983 claims to the Michigan Wrongful Death Act. *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 601 (6th Cir. 2006) ("To the extent that damages stemming from the death itself might be needed to fulfill the deterrent purpose of section 1983 (there being no compensation from the death as such), we see no reason to think that damages for injuries suffered before death would not be sufficient in most cases. Michigan's wrongful death act, to repeat, authorizes an award of damages for survivors' losses of support, society, and companionship.")

Plaintiff brings one claim under § 1983 and requests "all damages permitted to the deceased's estate pursuant to the Michigan Wrongful Death Act." (ECF No. 1, PageID.7.) The Michigan Wrongful Death Act applies to damages claims brought by a personal representative where "the death of a person . . . shall be caused by wrongful act, neglect, or

41

fault of another" and where, "if death had not ensued, [] the party injured [could have] maintain[ed] an action and recover damages." M.C.L. § 600.2922(1).

Plaintiff's damages claim under § 1983 are properly articulated through Michigan's Wrongful Death Act. Accordingly, Plaintiff's claim may proceed.

## IV.   CONCLUSION

For the reasons set forth above, the Court DENIES Defendant Bierenga's motion for summary judgment.

IT IS SO ORDERED.

Dated: September 9, 2020            s/Judith E. Levy
Ann Arbor, Michigan                JUDITH E. LEVY
                                   United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 9, 2020.

                                   s/William Barkholz
                                   WILLIAM BARKHOLZ
                                   Case Manager